UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VIRGIL NAPIER,

                Petitioner,                             Hon. Janet T. Neff

v.                                                  Case No. 1:13-CV-660

LLOYD RAPELJE,

                Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on Napier's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Napier's petition be **denied**.


**BACKGROUND**

        As a result of events which occurred on or about September 26, 2010, Petitioner was charged with first degree criminal sexual conduct. (Trial Transcript, May 18, 2011, 6-7). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Adam VanDeuren**

VanDeuren was employed as a special agent with the Federal Bureau of Investigation (F.B.I.) specializing in "crimes against children."  (Trial Transcript, May 18, 2011, 273-74).  In October 2007, an undercover agent was involved in an investigation "looking for individuals that are on the Internet trading child pornography."  (Tr. 273-74).  This investigation revealed that Petitioner was maintaining on his personal computer, and sharing with others, several images of child pornography involving prepubescent females.  (Tr. 274-83).  VanDeuren subsequently interviewed Petitioner as part of the investigation.  (Tr. 283).  Petitioner informed VanDeuren that he "does download child pornography and looks at the child pornography, typically late at night because he didn't want his wife to know what he was doing, and then he would masterbate to the images and then delete the images."  (Tr. 283).  Petitioner "admitted that he was addicted to looking at those images."  (Tr. 283).  Petitioner "described his addiction as a cup of coffee, [an] addiction similar to having a good cup of coffee."  (Tr. 283).

**B.M.**

As of the date of Petitioner's trial, B.M. was six years of age.  (Trial Transcript, May 18, 2011, 175).  After conducting a preliminary examination of B.M., the trial judge concluded that B.M. "does have the competence to testify as to truth and reality versus what is not true or what is not real."  (Tr. 175-79).  Neither party objected to this determination.  (Tr. 179).

Petitioner and his wife, Constance, are B.M.'s maternal grandparents.  (Tr. 180-85, 196, 223).  B.M. and her family lived with Petitioner and his wife "for a long time."  (Tr. 180-83).  When B.M. was asked, "was there a time when you were living with [Petitioner] that he did

something to you you didn't like," B.M. responded, "yes."  (Tr. 185).  When asked to "tell this jury

the story," B.M. responded:

> Umm, me and my sister was sleeping in my bed, and he woke me up
> to go to the bathroom.  He set me on the counter, and then, umm, he
> only licked in the back of my butt, but only in, in the front, too, a
> little.  And, umm, he then say - he said that, umm -

(Tr. 185).

At this juncture, the prosecuting attorney interrupted B.M. in an apparent attempt to

get her to slow down.  (Tr. 185).  The prosecutor then began asking B.M. more narrowly focused

questions which prompted shorter and more direct responses.  (Tr. 185-86).  When asked what

happened after she "finished going to the bathroom," B.M. reiterated that Petitioner engaged in

behavior which she described as "licking in the back and the front." (Tr. 186).  When pressed further

on the matter, B.M. indicated that Petitioner "was holding [her] two legs with one hand" and

"licking" her "right by [her] butt." (Tr. 190-91).  When asked whether her underwear was on or off

during this encounter, B.M. reported that she thought Petitioner "set them on the floor because they

wasn't on my legs." (Tr. 191-92).  B.M. further testified that she could feel Petitioner licking her

"body" and that "it felt scratchy because he had [a] beard." (Tr. 191-92).  B.M. reported that "it felt

like he was wiggling his tongue. . .in my butt and. . .right by my butt hole." (Tr. 192-93).  Petitioner

asked B.M., "do you like it?" (Tr. 191).  B.M. responded, "no," at which point Petitioner told B.M.

"not to tell anyone" and, furthermore, that "this was a dream." (Tr. 191-92, 195).

B.M.'s mother and Petitioner's wife were both away when these events occurred. (Tr.

194).  B.M. returned to bed, but subsequently awoke and went into her mother's bedroom. (Tr. 194).

B.M.'s mother had by that time returned home and B.M. "told her what happened and stuff." (Tr.

194).  When questioned as to whether her mother instructed or coached her what to say, B.M. testified that her mother only said "I got to tell the truth."  (Tr. 210).

**Nichole Mendez**

Mendez is B.M.'s mother.  (Trial Transcript, May 18, 2011, 223).  Petitioner and his wife are her parents.  (Tr. 223-24).  As of September 26, 2010, Mendez and her three children were living with Petitioner and his wife.  (Tr. 223).  Mendez and her family had been living with her parents for "about two years" and the relationship between the two families was "great."  (Tr. 223-24).

As September 26, 2010, Mendez's maternal grandmother "was dying."  (Tr. 224-25).  On this particular evening, Mendez and her mother visited with Mendez's grandmother to "say our last good-byes."  (Tr. 225).  Petitioner agreed to remain at home to "watch the kids."  (Tr. 225).  Mendez did not return home until approximately 4:00 a.m.  (Tr. 226).  As soon as she returned home, Mendez "went straight to bed."  (Tr. 226).  Shortly thereafter, B.M. crawled into bed with Mendez.  (Tr. 226-27).  B.M. attempted to tell her mother "something about getting up to go the bathroom and something about the bathroom counter," at which point Mendez instructed B.M. to "go to sleep" and "tell me tomorrow."  (Tr. 227-29).  Mendez did not believe that B.M. wanted to discuss anything of significance. (Tr. 228-29).  Instead, Mendez simply thought that B.M. was having difficulty sleeping and wanted to talk.  (Tr. 228).

Later that morning, Mendez was speaking on the telephone with her husband when she heard "a thump" from upstairs immediately after which she heard her mother yelling her name.  (Tr. 229).  Mendez ran to her parents' bedroom where she discovered Petitioner "laying on his back

4

on the floor with his arms just kind of, you know, up in the air, moving really slow."  (Tr. 229).

Mendez's mother was "kneeled down next to Petitioner" screaming "call 9-1-1, call 9-1-1."  (Tr. 229).  After contacting 9-1-1, Mendez asked her mother, "what's going on?"  (Tr. 229-30).  Her mother responded, "I don't know.  He just fell out of bed."  (Tr. 230).

As part of their initial assessment of Petitioner, EMS personnel asked Mendez to identify any medications Petitioner was taking.  (Tr. 230-31).  Mendez began collecting Petitioner's various prescription bottles and in the process discovered that a "brand new" bottle of 60 Xanax tablets was completely empty.  (Tr. 231-33).  The EMS personnel then asked Petitioner if he took "all of his Xanax" to which Petitioner responded, "yes."  (Tr. 232).  When asked whether he knew he was taking all of his Xanax, Petitioner again responded, "yes."  (Tr. 232).  When he was asked, "did you try to kill yourself?," Petitioner stated, "yes."  (Tr. 232).

Mendez then "started thinking, you know, why would he try to kill himself."  (Tr. 233).  Mendez observed that Petitioner "had talked about suicide many times because of the FBI investigation," but she noted that "there hasn't been anything new with that investigation that would do it."  (Tr. 233-34).  Mendez then remembered B.M. trying to talk with her earlier that morning and she wondered "what if something happened, what could have happened."  (Tr. 234).  Mendez immediately located B.M. and asked her, "can you tell me what you were going to tell me last night?"  (Tr. 234).  B.M. then told her mother that after "she went potty," Petitioner "put her on the bathroom counter and started kissing and licking her body, and then he put her back to bed."  (Tr. 234).  According to Mendez, B.M. had not yet learned to distinguish between her various body parts instead simply referring to "her privates" as "her body."  (Tr. 252-54).

Later that day, Mendez left her children with her mother-in-law and went to the

5

hospital to question Petitioner about what occurred the previous evening.  (Tr. 235-36).  Mendez asked Petitioner, "if I ask you a question, will you answer me honestly?"  (Tr. 236).  Petitioner did not respond, at which point Mendez did not question him further.  (Tr. 237).  Mendez then realized that she needed to "take [B.M.] to be checked."  (Tr. 237-38).  Mendez immediately arranged for B.M. to be examined at an emergency room.  (Tr. 238-39).  Later that evening, Mendez spoke with a detective who informed her that B.M. would need to be interviewed at the Child Advocacy Center. (Tr. 239-40).  With respect to this, Mendez was instructed "Don't say anything to [B.M.].  Don't question her.  Just tell her that she just has to talk to somebody."  (Tr. 240).  Mendez testified that she complied with these instructions.  (Tr. 240-41).  Mendez further testified that she never coached or told B.M. what to say, except to tell B.M. "just to tell the truth."  (Tr. 241, 251-52).  Mendez later provided detectives with a towel from the bathroom as well as underwear that B.M. may have been wearing on the night in question.  (Tr. 240-48).  Mendez reported that on the night in question, Petitioner's facial hair was fashioned into a "short goatee."  (Tr. 248).

Mendez indicated that she learned from her mother that Petitioner was being investigated by the FBI "for child pornography."  (Tr. 250).  When asked why she would let her children be around Petitioner, Mendez stated that "I didn't know it was little kids.  I was told it was teenage girls.  I didn't know it was little kids."  (Tr. 250).  According to Mendez, prior to the incident in question, her relationship with her parents was "great" and it was only after such that their relationship soured.  (Tr. 250-51).

**Dr. N. Debra Simms**

Dr. Simms was permitted to testify as an expert "in forensic pediatric care as well as

6

child sexual abuse." (Trial Transcript, May 18, 2011, 289-90). Dr. Simms conducted the initial medical examination of B.M. following her allegations of abuse. (Tr. 292-93). Dr. Simms performed a complete physical examination of B.M. the results of which were "normal." (Tr. 293-96). The doctor indicated that this was expected given the nature of B.M.'s allegations. (Tr. 296). During this examination, B.M. referred to her "bottom as butt" and her genital area as "body" or "whole body." (Tr. 298, 303-05).

**Sarah Thibault**

As of the date of the relevant events, Thibault was employed as a forensic scientist with the Michigan State Police. (Trial Transcript, May 18, 2011, 146-47). Thibault performed forensic testing of several items: (1) a pair of underwear reportedly worn by B.M.; (2) a brown washcloth; and (3) vaginal and rectal swabs obtained from B.M. (Tr. 151-52). Testing of the underwear revealed no evidence of saliva or seminal fluid. (Tr. 153-54). Testing of the washcloth "did not indicate the presence or possible presence of any biological materials." (Tr. 157). Testing of the swabs revealed no evidence of saliva or seminal fluid. (Tr. 159).

**Constance Napier**

As of the date of Petitioner's trial, Napier and Petitioner had been married 32 years. (Trial Transcript, May 18, 2011, 316). Napier and Petitioner have two children, Nichole Mendez and her twin sister Cassie. (Tr. 316). Mendez, along with her children, moved in with her parents in or around August 2008. (Tr. 316-17). At the outset of this arrangement, the relationship between Napier and her daughter was "fine," but "[a]s time went on, it got a little bit worse and worse." (Tr.

7

317).  On the day of the incident between Petitioner and B.M., Napier and Mendez traveled together to visit Napier's dying mother.  (Tr. 323-28).  Napier found it "pretty strange" that Mendez would accompany her to visit her mother because Mendez "never liked" her mother and "despised the earth [she] walked on."  (Tr. 324).  Napier's mother passed away several hours later and the pair did not return home until approximately 4:30 a.m.  (Tr. 323-29).

Later that morning, Napier was sitting at the dining room table when she heard a "thud" which originated in her bedroom.  (Tr. 332).  When Napier entered her bedroom she observed Petitioner laying on the floor and his eyes "rolled to the back of his head."  (Tr. 332).  Mendez contacted emergency medical personnel and Petitioner was subsequently transported to a hospital. (Tr. 332-35).  Later that day, Napier asked Petitioner, "do you know where you are?" to which Petitioner stated, "in the hospital."  (Tr. 336).  Napier then asked Petitioner, "do you know why you're here?" to which Petitioner responded, "I took some pills."  (Tr. 336).  When Napier asked Petitioner, "did you try to kill yourself," Petitioner responded, "later."  (Tr. 336).  Napier subsequently conceded, however, that she previously told the police that Petitioner's response to this latter question had, in fact, been, "It's something we're going to have to deal with later."  (Trial Transcript, May 19, 2011, 8).  Shortly thereafter, Mendez informed her mother of B.M.'s allegations against Petitioner.  (Tr. 10).  Napier's immediate response was to tell Mendez to "have [B.M.] checked."  (Tr 10-11).

Napier acknowledged that she was aware that Petitioner had previously been investigated for involvement with child pornography.  (Tr. 8-9).  Petitioner acknowledged to his wife "that he looked at child pornography," but asserted "that was all."  (Tr. 8-9).  Napier denied that Petitioner ever vocalized suicidal thoughts as a result of the investigation into his child pornography

proclivities.  (Tr. 9).  Napier also insisted that while B.M. resided with her, she was never exposed to pornography or inappropriate sexual activity.  (Tr. 25).

In the days following B.M.'s allegations against Petitioner, "tension" began to develop between Napier and Mendez.  (Tr. 12-14).  According to Napier, Mendez related three different versions of the alleged events.  (Tr. 16-17).  When Mendez suggested to Napier that she speak directly with B.M. about the matter, Napier declined.  (Tr. 15-16).  Napier testified that B.M. has a tendency "to make up stories."  (Tr. 17).

Napier conceded that Mendez "had a good relationship with her father," but suggested that shortly before the incident with B.M., the two had a falling out of sorts.  (Tr. 14).  In the weeks prior to the incident in question, Mendez's husband, Junior, was in prison.  (Tr. 20).  At some point, Mendez asked her mother if Junior "could come and parole at [her] house" when he was released from prison which was apparently supposed to take place in the near future.  (Tr. 20-23).  Napier told Mendez that she would have to ask Petitioner, who refused the request.  (Tr. 21).  According to Napier, following Petitioner's refusal, but before the incident between Petitioner and B.M., Mendez told her mother that she "would regret and pay for anything [she had] ever said or done."  (Tr. 22).  When questioned by the prosecuting attorney, however, Napier conceded that she was not aware that Junior "could not parole to Ottawa County" where she and Petitioner lived.  (Tr. 27).


**Breah Groen**

As of September 28, 2010, Groen was employed as a forensic interviewer at the Children's Advocacy Center of Ottawa County.  (Trial Transcript, May 19, 2011, 31, 46).  On this date, Groen interviewed B.M.  (Tr. 46).  Groen testified that "the goal of a forensic interview is to

9

obtain a statement from a child in a way that is neutral, truth-seeking, and developmentally appropriate, and it's meant to support fair and accurate decision-making in the court system as well as the child welfare system." (Tr. 31-32). According to Groen, a forensic interview consists of "two important components," first that the interview is "child-centered" and, moreover, that it is "hypothesis-testing rather than hypothesis confirming." (Tr. 32). Groen described a "child-centered" interview as one where "the contents and the questions that we're asking are also child-centered, so that it's matching the developmental level of a child, the age of the child and how they're able to function based on what stage they're functioning at." (Tr. 32)

Groen testified that forensic interviews are conducted in a "child-friendly room" with just herself and the child. (Tr. 32). However, because effective forensic interviews require a "team" approach, other individuals observe the interview through a double-sided mirror. (Tr. 32-35). During the interview Groen wears an ear bud that enables the other team members to communicate with her. (Tr. 46). Groen indicated that these interviews are also videotaped and subjected to a peer review process with other interviewers in an effort to "make sure we're following protocol consistent with the best practices in the field." (Tr. 35). Groen emphasized that "we want to make sure the information coming from the interview is coming from a child freely and not from anything the interviewer led or suggested the child to say." (Tr. 36). Accordingly, the interview begins "with the most open-ended questions" and progresses to "more direct or specific questions" only as the need for clarification arises, "but never leading the child to say something or suggesting that we want to hear a certain answer." (Tr. 37). Accordingly, direct questions are discouraged, but "any time a 'yes' or 'no' question or a direct question is asked, it is always followed up with 'tell me more about that' to ensure the child can then explain and support that direct answer they just provided." (Tr. 37).

10

With respect to the notion that a forensic interview should be conducted in a manner that is "hypothesis testing rather than hypothesis confirming," Groen stated that "the interviewer is not going into the interview to confirm that something happened to the child but instead to explore possibilities of why something like this may have come up, how a disclosure like this, how allegations like this could have been made, or why that child may have disclosed something like this." (Tr. 38). Prior to speaking with B.M., Groen spoke with B.M.'s mother after which Groen developed two possible alternative hypotheses for B.M.'s allegations. (Tr. 37-50). Specifically, Groen was concerned that B.M. "was attention-seeking, that she was bringing up the disclosure because she wanted attention and because she was trying to get people to notice her." (Tr. 47). Groen was also concerned that B.M. was "previously exposed to some kind of inappropriate sexual content, like pornography or inappropriate sexual touching, [or that] she had witnessed something." (Tr. 47).

When Groen asked Nichole Mendez "how she prepared [B.M.]" for the interview, Mendez replied, "I told her to tell the truth." (Tr. 78). Mendez also reported to Groen that B.M. had not previously been exposed to "any kind of inappropriate sexual content." (Tr. 79-80). B.M. reported to Groen that Petitioner licked her genitals and that it felt "scratchy." (Tr. 67-68, 72). B.M. told Groen that Petitioner instructed her "not to tell her mom" about what he had done. (Tr. 70-71). During Groen's interview, B.M. referred to her "private parts" as her "body." (Tr. 49-50).

**Robert Donker**

As of September 27, 2010, Donker was employed as a detective for the Ottawa County Sheriff's Department. (Trial Transcript, May 19, 2011, 31, 83). On that day, Donker, along

with a representative from Child Protective Services, traveled to Petitioner's residence.  (Tr. 83-84).

Donker spoke briefly with Nichole Mendez after which he arranged for B.M. to be interviewed the

following day at the Child Advocacy Center.  (Tr. 83-84).  Donker never spoke directly with B.M.,

but instead only observed, from an adjacent room, the subsequent interview between Breah Groen

and B.M.  (Tr. 84-85, 97).

On October 1, 2010, Donker met with Petitioner.  (Tr. 85).  Petitioner reported to

Donker that on the night in question, "he had been drinking that night, that he was emotionally upset,

and the next thing he knew he woke up a couple days later at Pine Rest."  (Tr. 85-86).  Donker then

asked Petitioner, "so, if someone said that you did something inappropriate that night, you really

don't have anything to say about that?" to which Petitioner simply responded, "well, I guess you

have me on that."  (Tr. 86).  When Donker asked Petitioner directly about B.M.'s allegations,

Petitioner "denied any type of sexual touching." (Tr. 91).  Petitioner indicated to Donker that on the

night in question he began drinking "around 7:00 o'clock."  (Tr. 92).  Petitioner began by drinking

whiskey and later "washed down" his Xanax with rum.  (Tr. 94).

Following the presentation of evidence, the jury found Petitioner guilty of first degree

criminal sexual conduct.  (Tr. 155-57).  Petitioner was sentenced to serve 25-30 years in prison.

(Sentencing Transcript, June 27, 2011, 7).  Petitioner appealed his conviction to the Michigan Court

of Appeals asserting the following claims:

> I.    Mr. Napier's conviction must be vacated because there was insufficient evidence presented at trial to convict him of CSC First, this violating his constitutional right to due process of the law.
>
> II.   The Circuit Court incorrectly admitted prior act evidence that failed to satisfy the requirements of

MRE 404(b).  By admitting the evidence pursuant to MCL 768.27(a) Mr. Napier's constitutional right to a fair trial void of improper evidence was violated.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Napier*, 2012 WL 4900465 (Mich. Ct. App., Oct. 16, 2012).  Asserting the same issues, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal.  *People v. Napier*, 828 N.W.2d 365 (Mich. 2013).  Asserting the same two issues identified above, Petitioner initiated the present action on June 19, 2013.

## STANDARD OF REVIEW

Napier's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of

14

the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the

15

merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).  Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."  *Id.* at 784-85.  Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."  *Id.*  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Sufficiency of the Evidence Claim

Petitioner asserts that he is entitled to relief because there did not exist sufficient evidence to convict him of first degree criminal sexual conduct.  The Court is not persuaded.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing

*Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect as of September 26, 2010, an individual was guilty of criminal sexual conduct in the first degree if he engaged in sexual penetration of a person "under 13 years of age." Mich. Comp. Laws § 750.520b(1)(a)(2010). Sexual penetration was defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." Mich. Comp. Laws § 750.520a(r)(2010).

B.M. testified that Petitioner licked her genitals. This testimony is sufficient to support Petitioner's conviction. *See* Mich. Comp. Laws § 750.529h ("[t]he testimony of a victim need not be corroborated" in prosecutions for first degree criminal sexual conduct). Additional evidence presented at trial, most notably the testimony of Breah Groen, Nichole Mendez, Detective Robert Donker, and F.B.I. Special Agent Adam VanDeuren likewise supports Petitioner's conviction. Petitioner argues that he is entitled to relief because "there was no physical evidence presented at trial." Specifically, Petitioner notes that the physical examination of B.M. following the incident in question revealed no evidence of injury. Petitioner further notes that the prosecution

17

was unable to introduce any DNA evidence establishing the veracity of B.M.'s allegations.  As Dr. Simms testified, however, given the nature of B.M.'s allegations, a lack of physical injury was to be expected.  As for the lack of DNA evidence, while such may be relevant it is hardly dispositive given the nature of the incident in question.

Simply put, Petitioner's argument is that the jury should have weighed the evidence differently and reached a different result.  The Court recognizes that Petitioner elicited, on cross-examination of several witnesses, evidence that arguably would have supported acquittal.  As previously noted, however, the evidence must be viewed in the light most favorable to the prosecution according the benefit of all reasonable inferences to the prosecution.  Moreover, to the extent there exists conflicting evidence, the Court must presume that the jury resolved any such conflicts in favor of the prosecution.  Petitioner is essentially asking this Court to re-weigh the evidence and substitute its judgment for that of the jury.  This is something the Court is simply not permitted to do.

The Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claim concluding as follows:

> The victim's testimony and what she told others viewed in a light most favorable to the prosecution supports a rational trier of fact's finding that the essential elements of the crime were proven beyond a reasonable doubt.  Additionally, although a victim's testimony need not be corroborated, other circumstantial evidence, including his attempted suicide and his involvement with child pornography, supports defendant's conviction.

*Napier*, 2012 WL 4900465 at *2.

In light of the authority above and the evidence of record, the Court concludes that the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly

established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Evidentiary Claim

As previously noted, F.B.I. Special Agent Adam VanDeuren testified regarding Petitioner's addiction to and possession of child pornography.  Petitioner asserts that the introduction of this evidence was "unconstitutional and corrupted the jury verdict."

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.  *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*  In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not "require a perfect trial," *Clemmons*, 34 F.3d at 358,

and, moreover, courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.*  As is well recognized, however, the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.  *Bugh*, 329 F.3d at 512-13 ("there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence"); *Burger v. Prelesnik*, 826 F.Supp.2d 997, 1010-11 (E.D. Mich. 2011) (same).  As noted above, in the absence of Supreme Court authority holding that the admission of evidence of prior bad acts violates the Constitution, laws, or treaties of the United States, Petitioner is not entitled to habeas relief.  *Bugh*, 329 F.3d at 512-13.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Napier's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file

objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  April 9, 2015                   /s/ Ellen S. Carmody
                                       ELLEN S. CARMODY
                                       United States Magistrate Judge